# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

James E. Allen,                              :              Case No. 01:11CV00813

      Petitioner,                        :

vs.                                          :

Donald Morgan, Warden,                       :              **MAGISTRATE'S REPORT AND
                                                            RECOMMENDATION**

      Respondent.                        :

## I. INTRODUCTION.

This case was automatically referred to the undersigned Magistrate Judge for report and recommendation pursuant to 72.2(b)(2) of the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES.  Pending are (1) Petitioner's Petition under 28 U. S. C. § 2254 for Writ of Habeas Corpus and Respondent's Return (Docket Nos. 1 & 11) and (2) Petitioner's "Motion Brief to Support 28 U. S. C. § 2254" and Respondent's Reply (Docket Nos. 14 & 15)  For the reasons that follow, the Magistrate recommends that the Court deny the Petition for Writ of Habeas Corpus and the "Motion Brief."

## II. FACTUAL BACKGROUND.

Petitioner filed his habeas corpus Petition in April 2011, well after the 1996 effective date of the ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT (AEDPA), Pub. L. No. 104-

132, 110 Stat. 1214 (1996); therefore, the provisions of AEDPA apply to this case.  *See Keith v. Mitchell*, 455 F. 3d 662, 665-666 (6ᵗʰ Cir. 2006) (*see Lindh v. Murphy*, 117 S. Ct. 2059, 2067 (1997); *Frazier v. Huffman*, 343 F.3d 780, 787 (6ᵗʰ Cir. 2003), opinion altered on denial of reh'g, 348 F.3d 174 (2003), *cert. denied*, 124 S. Ct. 2815 (2004)).

Under AEDPA, "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  *Id.* (*citing* 28 U.S.C. § 2254(e)(1)).  The following evidence was presented at trial.

{¶ 8}  On January 11, 2006, in the middle of the afternoon, Jimmy Joe Maynard was shot multiple times at his friend Larry Manzo's home on East 71st Street, Cleveland, Ohio.  He was later pronounced dead at the hospital.  Several people testified to the events that occurred that day, including Allen.

{¶ 9}  Manzo lived with his girlfriend, Donna Schultz. Manzo testified to his long history of drug use; heroin was his "drug of choice."  He said that Maynard had come to his house with crack cocaine the night before he was murdered. Manzo, Schultz, Maynard, and Walter Karpell "part[ied] through the night." The next day, in the afternoon of January 11, the four needed more drugs so Maynard "ran home and got more money."  When Maynard came back, he had about $1,000 in a white envelope.  The group called "Rico" (later identified to be Kenyell Stewart) for drugs.  Stewart came to Manzo's house with a man who went by the street name "C" (later identified to be Richard Fortson).  Maynard paid Stewart for the drugs, and Stewart and Fortson left.

{¶ 10}  Manzo said that the four of them smoked the drugs Stewart sold them.  A while later, Stewart called Manzo and told Manzo that he had "something" for him to try, which Manzo understood to be heroin.  Stewart and Fortson arrived at Manzo's house for the second time that day.  Stewart told Fortson to give Manzo the heroin, and then Stewart went in the living room to find Maynard.  Fortson gave Manzo a "rock," not heroin.  Since Manzo was expecting heroin, he asked Fortson, "what is that?"  As soon as he said it, Manzo testified that he heard Stewart yell in the living room, "give me the money."  He then heard multiple gunshots.  Fortson grabbed the crack cocaine off the table and ran out the door, followed soon after by Stewart.  As Stewart ran past Manzo, Manzo saw the barrel of a gun sticking out of Stewart's pocket; the gun was underneath what appeared to be Maynard's envelope of money.  Manzo then ran into the living room and saw that Maynard had been shot.

{¶ 11}  Manzo explained that because they had all been getting high, they were concerned about the police coming.  They did not have any drugs left, but they hid their "pipe" before the police came.  When the police arrived, Manzo said they told them that someone had come through the back door and robbed Maynard.  Manzo explained that they lied to the police because they were afraid of Stewart and Fortson.  But much later, on October 19, 2006, Manzo told the police Stewart's name and telephone number.

{¶ 12}  On November 7, 2006, Detective Raymond Diaz showed Manzo a photo array containing Stewart's photo.  Manzo testified that although he recognized Stewart in the photo, he lied to Detective Diaz and told him that he could not identify Stewart.  But then on November 14, 2006, Manzo met with

2

police officers again and positively identified Stewart as the man who shot Maynard.  Manzo gave the police a statement and positively identified Fortson in a photo array.

{¶ 13}  Manzo explained that he also bought drugs from a man named "J" (later identified to be Allen).  Manzo purchased drugs from Allen for about a year prior to the shooting.  Manzo did not know Allen's real name, but he identified him in court.  Manzo said he spoke to Allen on the phone about 20 minutes prior to the shooting.

{¶ 14}  Karpell testified that he was sitting next to Maynard in the living room when Stewart walked in the room holding a gun.  Karpell said that Stewart demanded money from Maynard, but Maynard told him no.  Karpell ran out of the room at that point and then heard the gunshots.  Karpell knew Stewart as the drug dealer, "Rico."  Karpell said he lied to the police at first because he was afraid. But he eventually told them the truth in November 2006.  He also identified Stewart in a photo array.

{¶ 15}  Manzo's neighbor, Regina Coleman, testified that at the time of the shooting, she had just walked to her aunt's house.  She was inside her aunt's house when she heard the gunshots.  But when she heard them, she immediately stepped outside onto her aunt's porch and saw "two black males run to a green Caravan."

{¶ 16}  Police found four spent bullets and five .45 automatic shell casings.  Another bullet was later found.  Police experts determined that all five shell casings were fired from the same semi-automatic handgun, and all five bullets were also fired from the same gun.  Further, the bullets were "typical of a semi-automatic."

{¶ 17}  Sam Borsellino, co-owner of Atlantic Gun & Tackle, testified that on January 7, 2006, Allen purchased a .45 caliber semiautomatic handgun.

{¶ 18}  Kiara Hinton, Allen's girlfriend at the time of the murder, testified that she owned a 1996 teal-colored Oldsmobile Silhouette and that Allen regularly drove it in January 2006.

{¶ 19}  A couple of hours after the shooting, Allen went to the police station to report that his .45 caliber, semiautomatic High Point gun and several pieces of jewelry had been stolen out of his car.  Police officer Randy Jerse took the report.  Allen told Officer Jerse that he left his car running while he went into a house.  His gun was in a shoebox on his front seat.  When he came back out several minutes later, the shoebox was gone.  Allen told Officer Jerse that he saw a black male take the shoebox, but he could not say which direction he went. Officer Jerse found it highly unusual that Allen saw the male but could not say which way he ran.

{¶ 20}  Officer John Lally testified he stopped Allen on January 24, 2006 for traffic violations. Allen was driving the green van.

{¶ 21}  Detective Raymond Diaz testified that he was assigned to the case in August 2006. At that point, police had not arrested anyone for Maynard's murder. In October of that year, Detective Diaz learned that Manzo and Schultz had been arrested on narcotics charges so he went to talk to them.  Based on his interview with Manzo, he learned "some street names of Rico and C as two possible suspects." Through further investigation, he was able to learn who "Rico" and "C" were.  Stewart and Fortson were ultimately arrested.

{¶ 22}  Detective Diaz also learned that Allen had been to Manzo's home earlier on the day of the shooting.  He already knew from previous police investigation that Allen's fingerprints were found on Manzo's rear storm door.  He also knew that calls were made from Allen's cell phone to Manzo's home on the day of the murder, and in particular, at the exact time of the murder.  And he knew that Allen had purchased a .45 semiautomatic handgun a few days before the murder.  Further, he talked to Hinton and discovered that Allen (her boyfriend) would drive her van often.  Detective Diaz also knew that Allen had been picked up in the green van on January 24, 2006 regarding an unrelated matter. Based on all of this information, Detective Diaz interviewed Allen for the first time on March 7, 2007 while Allen was an inmate at North Coast Correctional Facility.

{¶ 23}  Detective Diaz Mirandized Allen and asked Allen if he recalled the police report that he filed in January 2006.  Allen told Detective Diaz that he remembered he reported "the van had gotten

stolen." Allen later said that he had gone to Manzo's and Schultz's home in his uncle's Toyota around 9:30 p.m. on the night of the murder.  Detective Diaz asked him why he did not take the van, and Allen replied that his girlfriend had it.  Detective Diaz then asked Allen "about the fact that he had told [him] earlier that the van was stolen." (Detective Diaz did not testify to Allen's response to that question.) Detective Diaz eventually showed Allen his original police report where Allen had only mentioned the gun and jewelry being stolen.  Allen further denied that Stewart was the "black male" who stole his gun.

{¶ 24}  Detective Diaz asked Allen if he wanted to give a written statement and told him that he needed to be truthful.  Allen told him that he was being truthful.  Detective Diaz then testified, "I told him he wasn't."  Detective Diaz told Allen that he had a warrant for his arrest and gave Allen his business card and said that he told Allen, "when he wanted to talk again and wanted to be truthful to give [him] a call."

{¶ 25}  On March 14, Detective Diaz received a telephone call from a corrections officer at North Coast telling him that Allen wanted to speak to him.  Detective Diaz went to North Coast the following day and obtained a written statement from Allen.  Allen told Detective Diaz, "I was over at my house on East 80th when Rico and Face [Fortson] came to my house.  Rico told me, 'I need a favor and you can make some money, too.'  Rico then said, 'I have this lick [robbery] that we can hit and I do not even have to shoot the dude.' Before this, Rico said to me, 'I need to use your gun.' I then asked Rico where his lick was at.  Rico said, 'Over at Donna's house, this dude got an envelope full of money like he just came from the bank.' Rico then said, [']The nigga at the house is sweet and that he and Face can go hit the lick and bring me my gun and some money back.['] I told Rico [']No['] and that I would take them down there because I was not going to give them my gun and because there was no guarantee that they would show back up.  So I took them down there and I parked the van on East 70th and Ivy.  Rico and Face got out the van and they went into Donna's house.  After they got out the van I called Donna's house from my cell phone.  Donna answered the phone and I asked Donna what was going on down there. Donna said, ' * * * we are waiting for someone to bring some heroin down to the house.' * * * I was still talking to Donna on the phone and then I could hear gunshots being fired.  I could hear the shots through the phone.  Donna then said to me, 'Oh my God.'  Donna then hung the phone up on me.  The next thing I know Rico and Face came running back to my van.  They got into the van and we drove off.  After we left Ivy, Rico went into the envelope and he gave Face some money.  Rico then gave me some money from the envelope.  I believe Rico gave me like $100 or more at that time.  Rico then asked me about my gun.  Rico told me that I was going to have give him the gun and I told him no.  Rico then asked me, 'How much for the gun?' I told Rico that I paid $300 for the gun and Rico said, 'Alright' and he gave me some more money. I drove them back to East 81st Street and I dropped them off.  I turned around and I then drove to the police station.  When I got to the police station I filed a report saying that my gun was stolen out of my van.  After I made the police report I went to [Kiara Hinton's] house * * *. That was it."  Allen further stated that Stewart had given him approximately $500 out of the envelope, and that he had been to Manzo's earlier on January 11, just after midnight, to sell drugs.

{¶ 26}  After answering detailed questions about the events leading up to and after the murder, Allen told Detective Diaz, "The intentions on that day were not for that man to get killed.  I want to tell his family that I apologize for what had happened and I pray to God that he forgives us for what happened. Let the word get out I'm very sorry for what had happened and apologize."

{¶ 27}  Keith Martin, technical support supervisor for Revol Wireless, testified that Allen had a cell phone account with Revol.  Through Allen's call records on the day of the murder, Martin identified several calls made from Allen's cell phone to Manzo's home phone.  The calls were made at 7:18 a.m., 4:53 p.m., 5:00 p.m., and 6:13 p.m.  Martin explained that for the call placed at 4:53 p.m. (the time of the murder), " *67" was dialed before Manzo's telephone number.  He explained that " *67" blocks the number from someone's caller ID.  This was the only time " *67" was used.

{¶ 28}  Martin explained that when a call is dialed from a cell phone, it is processed from a "cell site."  In urban areas, cell sites are typically located within "three-quarters of a mile to a mile."  He testified that the call placed at 4:53 p.m. was processed through cell site "158/258," which is the closest

cell site to Manzo's home, .685 miles away.

{¶ 29}  At 6:22 p.m., a call was placed to 9-1-1 from Allen's cell phone.  Martin testified that the cell site that originally processed this call was the one closest to Manzo's address, but that the call ended at another cell site.  This indicated that the person using the phone was traveling away from one cell site towards another, called a "hand off."

{¶ 30}  Allen's cellular records further indicate that his phone received calls from Manzo's home telephone on January 11, 2006 at 4:04 a.m., 6:45 a.m., 7:14 a.m., 7:28 a.m., 7:33 a.m., 12:42 a.m., 10:13 p.m., and 10:35 p.m.

*State v. Allen*, 2010 WL 27548, *1 -5 (2010)

### III. PROCEDURAL BACKGROUND.

A.    INDICTMENT AND DISMISSAL OF CASE NO. CR-07-493820.

In January of 2007, Petitioner was indicted by a Cuyahoga County Grand Jury on the

following counts:

> COUNT 1    Aggravated murder, a violation of OHIO REV. CODE § 2903.01(A) with a firearm specification, a violation of OHIO REV. CODE § 2941.145 and a felony murder specification.
>
> COUNT 2    Aggravated murder, a violation of OHIO REV. CODE § 2903.01(B), with a firearm specification under OHIO REV. CODE § 2941.145 and a murder specification.
>
> COUNT 3    Aggravated robbery, a violation of OHIO REV. CODE § 2911.01(A)(1) with a firearm specification under OHIO REV. CODE § 2941.145.
>
> COUNT 4    Aggravated robbery, a violation of OHIO REV. CODE § 2911.01(A)(3) with a firearm specification under OHIO REV. CODE § 2941.145.

(Docket No. 11, Attachment 1, pp. 1-4 of 280).

On July 8, 2008, Petitioner's *motion in limine* requesting that the court prohibit the

prosecuting attorney from commenting on Petitioner's unsworn statement was denied.  On

October 6, 2008, Petitioner's motion to suppress the statements he made during questioning and

all evidence seized during a search was denied (Docket No. 11, pp. 12, 22 of 280).  On October

17, 2008, the death penalty specification was dismissed, with prejudice, as to Counts 1 and 2

(Docket No. 11, p. 23 of 280).  On October 22, 2008, the case was dismissed with prejudice

because Petitioner has been re-indicted as Case No. CR 08 512641 (Docket No. 11, p. 24 of

5

280).

**B.      RE-INDICTMENT IN CASE NO. CR-07-512641, TRIAL AND SENTENCING.**

During the May of 2008 term, Petitioner was re-indicted by a Cuyahoga County Grand

Jury on the following counts:

| | | |
|---|---|---|
| COUNT 1 | Aggravated murder, a violation of OHIO REV. CODE § 2903.01(A) with a firearm specification, a violation of OHIO REV. CODE § 2941.145 and a felony murder specification. | |
| COUNT 2 | Aggravated murder, a violation of OHIO REV. CODE § 2903.01(B), with a firearm specification under OHIO REV. CODE § 2941.145 and a murder specification. | |
| COUNT 3 | Aggravated robbery, a violation of OHIO REV. CODE § 2911.01(A)(1) with a firearm specification under OHIO REV. CODE § 2941.145. | |
| COUNT 4 | Aggravated robbery, a violation of OHIO REV. CODE § 2911.01(A)(3) with a firearm specification under OHIO REV. CODE § 2941.145. | |

(Docket No. 11, Attachment 1, pp. 24-28 of 280).

On October 17, 2008, the death penalty specifications in Counts 1 and 2 were dismissed

with prejudice (Docket No. 11, Attachment 1, p. 41 of 280).  A jury trial commenced on October

20, 2008.  On November 18, 2008, the court filed its sentencing entry with the following

findings:

| | |
|---|---|
| COUNT 1 | Not guilty of aggravated murder. |
| COUNT 2 | Not guilty of aggravated murder |
| | Guilty of a lessor included offense, murder, a violation of OHIO REV. CODE § 2903.02, with a firearm specification. |
| COUNT 3 | Guilty of aggravated robbery with a firearm specification. |
| COUNT 4 | Guilty of aggravated robbery with a firearm specification. |

(Docket No. 11, Attachment 1, p. 42 of 280).

On November 19, 2008, the court filed an judgment of conviction in which the court

imposed a sentence of 28 years to life, three years on the firearm specification to be served prior

to and consecutive with fifteen years to life on Count 2; three years on the firearm specification

to be served prior to and consecutive with ten years on the base charge on Count 3; and three

6

years on the firearm specification to be served prior to and consecutive with ten years on the base charge on Count 4.  All firearm specifications merged for a total of three years on firearms to be served prior to and consecutive to sentences on the bodies; the body of the Count 3 is to be served consecutive to the body of Count 2; and the body of Count 4 merges with the body of Count 3 (Docket No. 11, Attachment 1, p. 43 of 280).

C.    THE DIRECT APPEAL.

Petitioner perfected a notice of appeal in the Court of Common Pleas for Cuyahoga County, Ohio, on December 1, 2008 (Docket No. 11, Attachment 1, p. 45 of 280).  On May 4, 2009, Petitioner presented four assignments of error/issues to court of appeals:

1.    The trial court erred in denying Petitioner's motion for acquittal as to charges when the state failed to present sufficient evidence against Petitioner.
2.    Petitioner's convictions are against the manifest weight of the evidence.
3.    Petitioner was denied a fair trial by the detective's improper comments while testifying.
4.    The trial court erred by ordering convictions and a consecutive sentence for separate counts of murder and aggravated murder because the offenses are allied offenses pursuant to R. C. § 2941.25 and they are part of the same transaction under R. C. § 2929.14.

(Docket No. 11, Attachment 1, pp. 77, 79 of 280).

On January 19, 2010, the Court of Appeals journalized a decision which overruled all four assignments of error and affirmed the conviction (Docket No. 11, Attachment 1, pp. 153-179 of 280).

D.    APPEAL TO THE SUPREME COURT OF OHIO

On March 1, 2010, Petitioner filed a notice of appeal in the Supreme Court of Ohio (Docket No. 11, Attachment 1, pp. 206-207 of 280).  In the memorandum, Petitioner reiterated the propositions of law and arguments presented to the appellate court and gave the following explanations as to why his claim involved a substantial constitutional question:

7

    1.      The State of Ohio is required to prove his guilt beyond all reasonable doubt.
    2.      The State of Ohio must provide evidence of every element of an offense.
    3.      Petitioner's conviction was against the weight of the evidence.

(Docket No. 11, Attachment 1, pp. 210, 218-223 of 280).

Chief Justice Eric Brown determined on May 26, 2010, that Petitioner's appeal did not involve a substantial constitutional question (Docket No. 11, Attachment 1, p. 252 of 280).

**E.**    **REQUEST FOR POST-CONVICTION RELIEF.**

On April 1, 2010, Petitioner filed a "notice of intent to file criminal rule 26B" on April 1, 2010, in the appellate court.  There were two claims included within the memorandum attached to the notice:

    1.      Petitioner was indigent and unable to obtain trial transcripts.
    2.      The State of Ohio must provide trial records.

(Docket No. 11, Attachment 1, pp. 180-182 of 280).

On June 16, 2010, Petitioner filed the actual application for reopening pursuant to APP. R. 26(B) and attached memorandum which included with eight claims:

    1.      Ineffective assistance of counsel on appeal.
    2.      No constitutionally valid law exists from which an Ohio trial court derives the authority to impose the terms of imprisonment contained in OHIO REV. CODE 2929.14(A).
    3.      The indictments for aggravated murder and murder did not include the essential element of intent to kill; therefore, the indictment was insufficient to charge a criminal offense and did not invoke the subject matter jurisdiction of the trial court.
    4.      None of the aggravated robbery indictments in Ohio are sufficient to charge a criminal offense.
    5.      The indictments for felony murder, aggravated robbery and aggravated burglary are insufficient to charge any criminal offenses under the statutes of Ohio.
    6.      Petitioner was denied an impartial jury.
    7.      Petitioner's trial counsel was ineffective.
    8.      The trial judge violated his Fourteenth and Eighth Amendment rights by imposing the maximum sentence on the aggravated robbery charge.

(Docket No. 11, Attachment 1, pp. 184-191 of 280).

8

On February 8, 2011, the court of appeals denied the application for reopening as untimely filed (Docket No. 11, Attachment 1, pp. 199-203, 204 of 280).

F.    PETITION FOR WRIT OF HABEAS CORPUS.

Petitioner filed a Petition under Section 2254 for Writ of Habeas Corpus on April 25, 2011, alleging two grounds for relief:

First, there was insufficient evidence upon which to convict Petitioner.  The supporting facts for ground one are that:

> (1)    Regina Coleman did not identify Petitioner as one of the shooters;
> (2)    Petitioner's gun was not identified as the gun used to shoot the victim; and
> (3)    Petitioner's statements made to Detectives Diaz and Sowa were coerced and therefore involuntarily made to avoid the death penalty.

Second, Petitioner is unlawfully imprisoned based on a conviction obtained by a violation of his rights.  The supporting facts for ground two are that:

> (4)    The jury clearly lost its way since there is no evidence linking Petitioner to the charges in the indictment; and
> (5)    Petitioner's second statement was coerced and involuntarily made.

(Docket No. 1).

### IV.  HABEAS STANDARD OF REVIEW.

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Balderson v. Miller,* 2012 WL 1344377, *8 (N. D. Ohio 2012) (*citing* 28 U.S.C. § 2254(d)).  The

controlling AEDPA provision states that a decision is "contrary to" clearly established federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Id.* (*citing Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (*quoting Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000)). A state court's adjudication only results in an "unreasonable application" of clearly established federal law when the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* (*citing Otte,* 654 F. 3d at 599–600; *quoting Williams*, 120 S. Ct. at 1523).

In order to obtain federal habeas corpus relief, a petitioner must establish that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (*citing Bobby v. Dixon*, 132 S. Ct. 26, 27 (2011) (*quoting Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011)). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Richter*, 131 S. Ct. at 786; *quoting Jackson v. Virginia*, 99 S. Ct. 2781, 2785, n. 5 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (*quoting Yarborough v. Alvarado*, 124 S. Ct. 2140, 2148 (2004)). The petitioner carries the burden of proof. *Id.* (*citing Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011)).

### V. PROCEDURAL REVIEW.

As a threshold matter, claims in federal habeas corpus can be pursued if certain procedural requirements are met. The Magistrate finds that Petitioner did not comply with the procedural prerequisites to federal habeas review of his third and fifth claims. Petitioner's third and fifth claims are barred from habeas review by procedural default unless excused.

**1.   EXHAUSTION STANDARDS OF REVIEW.**

Federal courts lack jurisdiction to consider a habeas petition claim that was not fairly presented to the state courts. *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004) (*citing Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). In determining whether a petitioner has fairly presented a federal constitutional claim to the state courts, a habeas court may consider whether (1) the petitioner phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) the petitioner relied upon federal cases employing the constitutional analysis in question; (3) the petitioner relied upon state cases employing the federal constitutional analysis in question; or (4) the petitioner alleged facts well within the mainstream of the pertinent constitutional law. *Id.* (*see Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (*citing McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding. *Drummond v. Houk,* 761 F. Supp. 2d 638, 662 (N. D. Ohio 2010) (*citing* 28 U.S.C. § 2254(b), (c); *see Rose v. Lundy*, 102 S. Ct. 1198, 1205 (1982)). Exhaustion is fulfilled once a convicted defendant seeks review of his or her claims on the merits from a state supreme court. *Id.* (*citing O'Sullivan v. Boerckel*, 119 S. Ct. 1728, 1732 (1999)). A habeas petitioner satisfies the exhaustion requirement when the highest court in the state in which the

11

petitioner has been convicted has had a full and fair opportunity to rule on the claims.  *Id.* (*citing Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994) (*citing Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990)).  If, under state law, there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred, and the federal habeas court cannot entertain the merits of the claim.  *Id.* (*see Rust*, *supra*).

A petitioner "'cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court.' "  *Id.* at 663 (*citing Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (*quoting Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)).  In circumstances where the petitioner has failed to present a claim in state court, a habeas court may deem that claim procedurally defaulted because the Ohio state courts would no longer entertain the claim.  *Id.* (*see Buell*, *supra*, 274 F.3d at 34).  To obtain a merit review of the claim, the petitioner must demonstrate cause and prejudice to excuse his failure to raise the claim in state court, or that a miscarriage of justice would occur were the habeas court to refuse to address the claim on its merits.  *Id.* (*citing Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (*citing Wainwright v. Sykes,* 97 S. Ct. 2497, 2506 (1977)).

2.     **PROCEDURAL DEFAULT STANDARDS OF REVIEW.**

In general, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure."  *Id.* (*citing Syke*s, 97 S. Ct. at 2506).  If a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that

failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* (*citing Coleman v. Thompson*, 111 S. Ct. 2546, 2564-2565 (1991)).

To be independent, a state procedural rule and the state courts' application of it "must rely in no part on federal law." *Id.* (*citing Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S. D. Ohio 2001) (*citing Coleman, supra*, 111 S. Ct. at 2555-2556). To be adequate, a state procedural rule must be " 'firmly established and regularly followed' " by the state courts at the time it was applied. *Id.* (*citing Beard v. Kindler,* 130 S. Ct. 612, 618 (2009) (*quoting Lee v. Kemna,* 122 S. Ct. 877, 885 (2002)). If a petitioner failed to timely present any federal habeas claims to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted those claims. *Id.* (*see Boerckel*, *supra,* 119 S. Ct. at 1734; *Rust*, *supra*, 17 F.3d at 160).

In *Maupin v. Smith,* 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined that now familiar test to be followed when the state argues that a habeas claim is defaulted because of the petitioner's failure to observe a state procedural rule. The four-part test is summarized as follows:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction-that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must consider whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.
>
> *Id.* (*citing Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (*citing Maupin, supra*,

785 F.2d at 138) (further citations omitted)).

In determining whether the *Maupin* factors are met, the federal court looks to the "last explained state court judgment." *Id.* (*citing Ylst v. Nunnemaker*, 111 S. Ct. 2590, 2595 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000)).  " '[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case clearly and expressly states that its judgment rests on a state procedural bar.' " *Id.* (*citing Morales*, 507 F.3d at 937) (*quoting Frazier v. Huffman,* 343 F.3d 780, 791 (6th Cir. 2003)).  Conversely, if the last state court to be presented with a particular federal claim reaches the merits, then the procedural bar is removed and a federal habeas court may consider the merits of the claim in its review.  *Id.* (*see Ylst*, *supra*, 111 S. Ct. at 2593).

If the first three *Maupin* factors are met, the claim is procedurally defaulted.  *Id.* However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review.  *Id.* (*see Maupin*, 785 F.2d at 138; *Hutchison v. Bell,* 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, *supra*, 205 F.3d at 274-275; *Coleman,* 111 S. Ct. at 2564-2565)).

To establish "cause" for the default, a petitioner must generally show that some objective factor, something external to himself, precluded him from complying with the state procedural rule.  *Kirby v. Beightler,* 2010 WL 3370534, *4 (N. D. Ohio 2010) (*citing Coleman*, *supra*, 111 S. Ct. at 2565).  Counsel's ineffectiveness in failing properly to preserve the claim for review in state court can establish cause for a default.  *Burroughs v. Makowski,* 411 F.3d 665, 667 -668 (6th Cir. 2005) (*citing Edwards v. Carpenter*, 120 S. Ct. 1587, 1591 (2000) (*citing Murray v. Carrier*,

106 S. Ct. 2639, 2645 (1986)).  To constitute cause, the ineffectiveness of counsel must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted.  *Id.*

Demonstrating "prejudice" requires the petitioner to show that the alleged constitutional error worked to his actual and substantial disadvantage, infecting the entire proceeding with error of a constitutional dimension.  *Kirby*, *supra,* at *4 (*citing United States v. Frady*, 102 S. Ct. 1584, 1595 (1982)).  There can be no prejudice if the petitioner cannot show a reasonable probability of a different outcome at trial.  *Id.* (*citing Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003)).

The "actual innocence" doctrine is derived from the Supreme Court's "fundamental miscarriage of justice" exception to the procedural default rule.  *Gibbs v. United States,* 655 F.3d 473, 477-478 (6th Cir. 2011) (*citing Schlup v. Delo*, 115 S. Ct. 851, 864 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain rare and would only be applied in the extraordinary case ... this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence." (internal quotation marks omitted)).  The Supreme Court has held that "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  *Id.* (*citing Murray v. Carrier*, 106 S.Ct. 2639, 2649-2650 (1986)).  However, "actual innocence" is an extremely narrow exception, and "claims of actual innocence are rarely successful."  *Id.* (*citing Schlup*, 115 S. Ct. at 865).  Moreover, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Id.* (*citing Herrera v. Collins*, 113 S.Ct. 853, 862 (1993)).

15

A fundamental miscarriage of justice is accomplished by a petitioner demonstrating that he or she is **actually** innocent of the crime for which he or she was convicted. *Brinkley v. Houk*, 2011 WL 6029941, *18 (N. D. Ohio 2011) (*citing Schlup, supra*, 115 S. Ct. at 861). Actual innocence means factual innocence, not mere legal insufficiency. *Id.* To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Bozsik v. Bradshaw*, 2010 WL 7702230, *46 (N. D. Ohio 2010) (*citing Schlup, supra*, 115 S. Ct. at 862). Therefore, to prevail on an actual innocence argument, a petitioner must support his or her allegations of constitutional error with new reliable evidence, whether it is exculpatory, scientific evidence, trustworthy eyewitness accounts or critical physical evidence that was not presented at trial. *Id.* (*citing Schlup, supra*, 115 S. Ct. at 865).

a.    PETITIONER'S FIRST, SECOND AND FOURTH CLAIMS FOR RELIEF WERE EXHAUSTED

It is essential that the legal claims raised in the state court must be the substantial equivalent of the claims raised in the federal petition. Here, Petitioner fairly presented his claims that Regina Coleman did not identify him as the shooter; that his gun was not identified as the gun used to shoot the victim; and that there is no evidence linking Petitioner to the charges in the indictment, in his direct appeal and in the memorandum in support of jurisdiction filed in the Supreme Court of Ohio. The sufficiency-of-the-evidence and against-the manifest-weight-of-the-evidence challenges to Petitioner's conviction have been adequately raised and are subject to habeas review (Docket No. 11, Attachment 1, pp. 153-159; 210; 218-223 of 280).

b.    PETITIONER'S THIRD AND FIFTH CLAIMS WERE NOT EXHAUSTED AND THEY ARE PROCEDURALLY DEFAULTED.

Petitioner's third and fifth claims allege that Detectives Diaz and Sowa coerced him to

16

make statements in return for a promise that the death penalty specification would not attach to the aggravated murder charges.  To the extent that Petitioner claims that his admissions were involuntarily made, he claims that his trial counsel was ineffective for failing to permit him to testify in that regard at the suppression hearing and his appellate counsel was ineffective for failing to present this issue on appeal.

Analyzing Petitioner's claims under the first part of the *Maupin* test, the Magistrate finds that Petitioner failed during the post-conviction appeal to present it to the state's highest court. Specifically, Petitioner failed to prosecute an appeal consistent with the RULES OF PRACTICE IN THE SUPREME COURT.  The appellate court expressly dismissed the appeal on the ground that it was untimely filed.  Thus, the first and second parts of the *Maupin* test were met.

The third part of the *Maupin* test requires the reviewing court to determine whether the state procedural rule at issue is an adequate and independent state ground upon which to deny habeas review.  The last state court from which Petitioner sought review invoked the state procedural rule as a basis for rejecting review of Petitioner's claims.  This state procedural rule constitutes an adequate and independent state ground that was firmly established and regularly enforced to foreclose review of a federal constitutional claim.

Since the first three questions in the *Maupin* paradigm have been answered in the affirmative, Petitioner's claims for habeas review will be considered waived unless he can demonstrate cause for the procedural default and actual prejudice resulting from an alleged constitutional error or he can show he is actually innocent and thus a manifest injustice will result.

Petitioner's claims of ineffective assistance of trial and appellate counsel cannot be used to show cause and prejudice for procedural default since such claims were themselves

procedurally defaulted.  Thus, to the extent that Petitioner is offering ineffective assistance of appellate and trial counsel as cause, his argument is without merit.

To persuade the district court that his Petition is not precluded from further review, Petitioner directs the Court's attention to new evidence, an affidavit of Richard Fortson, in which a hybrid claim consisting of two theories of actual innocence is presented.  First, Petitioner should be allowed to pass through the gateway and argue the merits of his barred claims because according to the affidavit of Richard Fortson, Petitioner is actually innocent.  Second, the affidavit of Richard Fortman constitutes a free-standing, substantive claim of Petitioner's innocence.

Insofar as both the Supreme Court and the Sixth Circuit have recognized that a showing of actual innocence can excuse a procedural default, the Magistrate must address whether Petitioner's new evidence is sufficient to overcome the procedural default of Petitioner's third and fifth claims.

In contrast, neither Court has yet to provide a definitive guidance on whether a free-standing actual innocence claim is cognizable in a habeas proceeding.  In *Zuern v. Tate,* 336 F. 478, 482 fn. 1 (6th Cir. 2003), the Court commented, without discussion, that the Supreme Court had precluded a free-standing claim of actual innocence in *Herrera*, *supra*, 113 S. Ct. at 860). On the other hand, in *Herrera*, the Supreme Court suggested that the new evidence would have to make an extraordinarily high threshold showing such that no rational trier of fact would find proof of guilt beyond a reasonable doubt.  *Id.*

Turning first to Petitioner's gateway claim of actual innocence, Richard Fortson's affidavit, in relevant part, emphasizes that Petitioner was neither the shooter nor the robber:

Mr. Allen did not have anything to do with the robbery or shooting of Mr. Jimmy Joe

18

Maynard.  I, Richard Fortson robbed Jimmy Joe Maynard along with an accomplice which the witnesses will testify that James was not involved.

I Richard Fortson only wrote statements on James E. Allen because the detectives told me if I didn't involve James Allen, I would get life without parole.  I was only seventeen years old at the time of my initial arrest.

The reason I'm coming forward now is that I know an innocent man is locked up because I lied on him.

I only said we used James' girl's van because the police kept telling me that Ke'Ke's van was used in the crime but it wasn't her van, they said it was cause, it was green so I went along with them cause me and James got into it a couple of times.

To the extent that Richard Fortson's affidavit is consistent with the testimony presented by Petitioner and Maynard, it corroborates that Kenyell Stewart and Fortson were in the house when Manson was shot and that Petitioner was not in the house when Manson was shot.  However, Richard Fortson's affidavit is unreliable when describing the use of the van, particularly since Petitioner admitted to the officers on May 15, 2007, that he used Kiara Hinton's van to transport Stewart and Fortson to Larry Manzo's house, that he waited in the van while Stewart and Fortson "hit the lick" and shot Manzo, and that he drove Stewart and Fortson away from the crime scene.  The unreliable new evidence fails to assist in raising sufficient doubt about Petitioner's guilt.

In addition, the affidavit of Richard Fortson fails to show that some action or inaction on the part of Respondent prevented Petitioner from discovering the relevant facts in a timely manner or that Petitioner could not have discovered those facts in time to file an appeal or motion for post-conviction relief.  The probative impact of this newly presented evidence in connection with the evidence of guilt adduced at trial is insufficient to warrant consideration of the otherwise barred claims.  Assessing how reasonable jurors would react to the newly supplemented record, it is not likely that any reasonable juror would have reasonable doubt.  In

19

short, Petitioner has not presented affirmative evidence or argument that some external obstacle prevented him from fairly presenting his federal claim in state court. Petitioner has not cleared the procedural bar of demonstrating a credible procedural claim of actual innocence; consequently, the Magistrate cannot address the merits of Petitioner's procedurally barred habeas Petition.

Assuming without finding that a habeas petitioner can assert a free-standing actual innocence claim, the Magistrate now analyzes Petitioner's substantive claim of actual innocence in light of the new evidence. Both Richard Fortman and Petitioner are incarcerated for their involvement in the murder and each has an interest in the success on the merits of this case. Even if taken as credible, Richard Fortman's averments would require the Court to accept as true that Petitioner had absolutely no involvement in the murder. As detailed above, Richard Fortman's affidavit serves to contradict, in part, the inculpating evidence that Petitioner supplied police involving his use of the van to transport Richard Fortman to and from the scene of the crime and his share of the bounty from the robbery. Richard Fortman's averments fall short of meeting the significantly greater burden of providing exculpatory evidence that would demonstrate that Petitioner is probably innocent.

### 3. THE MERITS OF PETITIONER'S FIRST, SECOND AND FOURTH CLAIMS FOR RELIEF.

The Magistrate construes Petitioner's claims that Regina Coleman did not identify Petitioner as one of the shooters; Petitioner's gun was not identified as the gun used to shoot the victim; and the jury clearly lost its way since there is no evidence linking Petitioner to the charges in the indictment. In his request for appellate review, Petitioner argued that the motion

20

to acquittal should be granted as there was insufficient evidence to warrant a conviction and that the conviction was against the manifest weight of the evidence. These issues were presented on direct appeal and in the memorandum of jurisdiction presented to the Supreme Court of Ohio.

A federal habeas court can only set aside a state-court decision on the basis that it constitutes an unreasonable application of clearly established Federal law if the state court's application of that law is objectively unreasonable. *McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (*citing Williams v. Taylor*, 120 S. Ct. 1495, 1521 (2000)). Expressed more fully, this means a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (*citing Jackson v. Virginia*, 99 S. Ct. 2781, 2792-2793 (1979); *see also Schlup, supra,* 115 S. Ct. at 868) ("The *Jackson* standard ... looks to whether there is sufficient evidence which, if credited, could support the conviction").

A conviction is supported by sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sanborn v. Parker,* 629 F.3d 554, 577 (6th Cir. 2010) (*citing Jackson, supra,* 99 S. Ct. at 2788–2789). The court conducting habeas review must also review the claim of whether a claim is supported by sufficient evidence through the lens of AEDPA; thus the question that faces the court is ultimately whether it was objectively unreasonable for the state court to conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the state, could have found that a defendant committed the essential elements of the crime charged beyond a reasonable doubt. *Id.* (*citing Pinchon v.*

*Myers*, 615 F.3d, 631, 643 (6th Cir. 2010) (*quoting Nash v. Eberlin*, 258 Fed. Appx. 761, 765 (6th Cir. 2007) (first, second, and fourth alterations in *Pinchon*)).

Having conducted an independent review of the evidence, the Magistrate recommends that the Court defer to the resolution of the jury as there is sufficient evidence to support the convictions for murder and aggravated robbery.  The direct evidence of guilt was adduced from Petitioner's statement made on March 15, 2007, after he was given the Miranda warning, that he was responsible for providing and operating the van in which he delivered Kenyell Stewart and Richard Fortson to "hit the lick."  At one time during questioning, Petitioner admitted that he loaned Mr. Stewart his gun and used his girlfriend's green van to transport Stewart and Fortson to the house where the murder occurred and then away from the crime.  Stewart even gave Petitioner some of the proceeds from the robbery (Docket No. 11, Attachment 7, pp. 15, 21-22, 24, 26, 28 of 252).

Felicia Simington, a crime scene investigator who specialized in latent fingerprint examinations, identified Petitioner's fingerprints in the inside surface of the green van as well as on the rear storm door interior glass upper surface at the crime scene location.  Petitioner had been at the residence early on January 11, 2006, to sell drugs (Docket No. 11, Attachment 5, pp. 8-13; 17-21 of 214; Docket No. 11, Attachment 7, pp. 174 252).

The circumstantial evidence showed that Maynard was killed with a .45 semi-automatic handgun that was similar to the gun purchased by Petitioner shortly before the murder (Docket No. 11, Attachment 7, pp. 128-134 of 252).  Nathan Willson, a forensic firearms examiner, linked the five spent shell casings from the homicide to a .45 semi-automatic handgun (Docket No. 11, Attachment 5, pp. 56-63 of 214).  Kiara Hinton, Petitioner's ex-girlfriend, explained that

22

she had an arrangement with Petitioner that permitted him to drive her 1996 Oldsmobile Silhouette, a teal van, in pursuit of a job.  He kept the car operational so often the car was in his custody (Docket No. 11, Attachment pp. 73-75 of 214).  On January 24, 2006, Officer John Lally, Cleveland Police Department, pulled Petitioner over while driving the green van seen by witnesses leaving the location of the murder (Docket No. 11, Attachment 4, pp. 232-234 of 236).

During his testimony, Petitioner gave an alternate version of events, explaining that he refused to give Rico the gun, that he dropped Rico and Face off on East 81st Street; that he did not murder Maynard and that he drove to the police station to report that his gun had been stolen from his van (Docket No. 11, Attachment 7, pp. 205-206 of 252).

Resolving all conflicting inferences in a light most favorable to the prosecution, the jury verdict must be upheld because a rational trier of fact could have found the co-existence of the statutorily enumerated elements of murder and aggravated robbery beyond a reasonable doubt. This Court must defer to the state appellate court's sufficiency determination so long as it is not unreasonable.  Petitioner's claims that his conviction was not based on substantial evidence are therefore defeated and not a basis for habeas relief.

Turning to the claim that the verdict may have gone against the great weight of the evidence, the Magistrate finds that this federal court cannot provide the relief requested.

A manifest weight of the evidence claim concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Scott v. Timmerman-Cooper,* 2012 WL 832652, *3 (N. D. Ohio 2012) (*citing State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 546 (1997)).  When reviewing a weight of the evidence claim, an appellate court sits as a "thirteenth juror," and reviews the jury's resolution of

23

conflicting testimony.  *Id.* (*citing Tibbs v. Florida*, 102 S. Ct. 2211, 2218 (1982)).  The jury is the sole finder of fact in a jury trial, and the jury determines the credibility of witnesses.  *Id.* (*citing United States v. Adamo*, 742 F.2d 927, 934–935 (6th Cir. 1984), *cert. denied*, 105 S. Ct. 971 (1985)).  A claim that a conviction was against the manifest weight of the evidence is a state law issue, and a federal habeas court has no power to grant habeas relief on the basis that a state conviction is against the weight of the evidence.  *Id.* (*citing Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985), *cert. denied*, 106 S. Ct. 1991 (1986); *Cameron v. Birkett*, 348 F. Supp.2d 825, 838 (E. D. Mich. 2004) (citing cases)).

Inherent in the process of determining if a conviction is against the weight of the evidence, the habeas court must weigh the evidence and assess the credibility of witnesses.  Such analysis does not implicate the constitution but raises issues of state law.  Insofar as Petitioner maintains that his conviction was against the manifest weight of the evidence, he states a claim founded solely on state law which cannot be addressed in this federal habeas corpus action.

### 4.    THE MOTION BRIEF.

In the Motion Brief, Petitioner makes an impassioned argument that manifest injustice has resulted.  The Petitioner argues that he was the lessor of those culpable in Maynard's murder and that his 28-year sentence is disproportionate to the severity of his offenses.  Petitioner suggests that his co-defendant, Kenyell Stewart, was more culpable in the shooting; however, Kenyell was acquitted on all charges.  Petitioner's argument fails, however, because he did not present on direct appeal or to the Supreme Court of Ohio, a clear and convincing case of an abuse of discretion by the trial judge in imposing his sentence.  Petitioner's argument is not subject to habeas review in this case.

## VI. Conclusion

For these reasons, the Magistrate recommends that the Court deny the Petition for Writ of Habeas Corpus, deny the Motion Brief and terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:        July 6, 2012


## VII. Notice

Please take notice that as of this date the Magistrate Judge's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to this report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's

25

report and recommendation foreclosed appeal to the court of appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.